Carl D. Crowell, OSB No. 982049
email: carl@crowell-law.com
CROWELL LAW
P.O. Box 923
Salem, OR 97308
(503) 581-1240
Of attorneys for plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **VOLTAGE PICTURES, LLC,** a California Limited Liability Company, and **DALLAS BUYERS CLUB, LLC**, a Texas Limited Liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>**DOE-50.141.97.4,**<br><br>Defendant. | Case No.: 3:14-cv-1872<br><br>COMPLAINT<br><br>COPYRIGHT INFRINGEMENT<br><br>ORS 647.105 – State Trademark<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT

Plaintiffs Voltage Pictures, LLC, ("Voltage") and Dallas Buyers Club, LLC ("DBC"), complain and allege as follows:

JURISDICTION AND VENUE

1.  This is a suit for copyright infringement under 17 U.S.C. §§ 101 et seq. ("The Copyright Act") and for a violation of ORS 647.105, Oregon's State Trademark Law.

2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

3.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a) as the defendant is believed to reside in this district.

## PARTIES

### PLAINTIFFS

5. Plaintiff Voltage a California Limited Liability Company and is a producer of the motion picture titled *Dallas Buyers Club,* released in 2013.

6. Plaintiff DBC is Texas Limited Liability Company and the registered copyright holder of *Dallas Buyers Club.*

### The Rights of DBC

7. *Dallas Buyers Club* is an acclaimed motion picture nominated for six Academy Awards (Oscars), winning Best Actor, Best Supporting Actor and Best Makeup. Plaintiffs' motion picture also won numerous Screen Actors Guild Awards, Golden Globes and other awards.

8. *Dallas Buyers Club*, has been registered with the United States Copyright Office by the owner, DBC, Registration No. PA 1-873-195, 2013

9. Under The Copyright Act, DBC is the proprietor of all copyrights, title, and related interest in the motion picture.

10. The motion picture contains wholly original material that is copyrightable subject matter under the laws of the United States.

11. The motion picture is currently offered for sale in commerce.

12. The motion picture is easily discernible as a professional work as it was created using professional performers, directors, cinematographers, lighting technicians, set designers and editors and with professional-grade cameras, lighting and editing equipment.

13. Defendant had notice of plaintiff's rights through general publication and advertising and more specifically as identified in the content of the motion picture, advertising associated with the motion picture, and all packaging and copies, each of which bore a proper copyright notice.

### Rights of Voltage

14. Voltage has sole and exclusive rights to use the mark VOLTAGE PICTURES in association with its goods and services both within the State of Oregon and nationwide.

15. Voltage marks its works with the trademark VOLTAGE PICTURES to distinguish its products from others and to identify it as the source of its products.

16. In the marketing of *Dallas Buyers Club*, Voltage has branded the motion picture with its famous, distinctive and registered trademark, VOLTAGE PICTURES.

17. The mark VOLTAGE PICTURES, and design, has been registered with the State of Oregon pursuant to ORS 647.015, Registry Number 42677.

### THE DEFENDANT

18. The defendant identified herein as DOE-50.141.97.4 is currently known only by their Internet Protocol ("IP") Address 50.141.97.4 which on 8/22/14 at 07:25:03 AM UTC, was observed infringing the motion picture.

19. Through geolocation, the IP address used by the defendant has subsequently been traced to the State of Oregon.

20. Defendant's IP address has been observed as associated with the peer-to-peer exchange of a large number of copyrighted titles through the BitTorrent network, a record of which can be filed with the Court on request.

21. The volume and titles of the activity associated with defendant's IP address indicates that the defendant is likely the primary subscriber of the IP address or someone who resides with the

subscriber, as such activity indicates the defendant is an authorized user of the IP address with permissive access.

22.     The volume of the activity associated with defendant's IP address indicates that anyone actively using or observing activity on the IP address would likely be aware of the conduct of the defendant.

23.     The volume and titles of the activity associated with defendant's IP address indicates that the defendant is not a young child, but an adult with mature tastes.

24.     The defendant's IP address was at that time of observed infringement managed by Internet Service Provider ("ISP") Comcast, who on information and belief, generally assigns an IP address to a single party for extended periods of time, often for months and provides Wi-Fi systems with notable pre-installed security and passwords.

25.     The records maintained by Comcast should be able to identify either the defendant, or the subscriber who contracted with Comcast for service who in turn is likely to have knowledge that will lead to the identity of the defendant.

26.     Plaintiffs intend to seek initial discovery to subpoena records from Comcast to ascertain the true identity of the defendant.

BACKGROUND

PEER-TO-PEER INTERNET PIRACY

27.     As noted by Senator Levin in Congressional hearings on peer-to-peer Internet piracy, "In the world of copyright law, taking someone's intellectual property is a serious offense, punishable by large fines.  In the real world, violations of copyright law over the Internet are so widespread and easy to accomplish that many participants seem to consider it equivalent to jaywalking – illegal but no big deal.  But it is a big deal. Under U.S. law, stealing intellectual property is just that – stealing.  It hurts artists, the music industry, the movie industry, and others

involved in creative work. And it is unfortunate that the software being used – called 'file sharing' as if it were simply enabling friends to share recipes, is helping create a generation of Americans who don't see the harm."

28. In 2013, in recognition of the growing problems and challenges with counterfeiting and piracy, The Oregon House of Representatives passed House Memorial 2, which made the following findings:

> Whereas the United States and other nations share the challenge of combating intellectual piracy and the counterfeiting of intellectual property such as … films… and technologies that affect the quality of life; and
> Whereas intellectual piracy and counterfeiting have a significant impact on Oregon's economy, and the economies of other states and of nations around the world, which results in job and earnings losses, reduced tax revenues and increased threats to public health and safety; and
> …
> Whereas protecting and enforcing intellectual property rights is crucial to the future of our innovation-based economy; and
> Whereas industries that use intellectual property extensively generate nearly $7.7 trillion in gross output and account for more than 60 percent of total exports from our nation; and
> Whereas industries that use intellectual property extensively … employ more than 19 million Americans, whose salaries average about 60 percent higher than salaries in industries that do not make extensive use of intellectual property; and
> Whereas intellectual property infringement can undermine the nation's economic security; and
> Whereas violations of intellectual property rights, ambiguities in the law and a lack of enforcement create uncertainty in the marketplace and in the legal system and undermine consumer trust; and
> Whereas intellectual property, including trademarks, [are] essential …; and
> …
> Whereas failing to adequately protect and enforce intellectual property rights will increase counterfeiting and illicit trade;
> …

29. As such it is clear that giving effect to 17 U.S.C. §§ 101 et seq. and ORS Chapter 647, and the enforcement of intellectual property rights, and in particular the fight against counterfeiting and piracy are critical issues of importance to the both the United States of America and the State of Oregon.

30. Peer-to-peer networks, at least in their most common form, are computer systems that enable internet users to: 1) make files (including motion pictures) stored on each user's computer available for copying by other users or peers; 2) search for files stored on other users' computers; and 3) transfer exact copies of files from one computer to another via the internet.

31. The particular peer-to-peer protocol at issue in this suit is the BitTorrent protocol.

32. To use BitTorrent, a user intentionally downloads a program that they install on their computer called a "client." The BitTorrent client is the user's interface during the downloading/uploading process. The client may be free, supported by advertising, offer upgrades or add on services for a fee, or a combination of several options.

33. Users then intentionally visit a "torrent site" or network site to find media or content available for download, often using a standard web browser.

34. A torrent site is often an advertisement-revenue based or subscription-supported index of media or content being made available by other users on the network and maintains a listing of movies and television programs among other copyrighted content.

35. A torrent site often promotes a motion picture through use of video trailers, images of movie posters, film stills and other marketing material, often copied from original authentic marketing material owned by the rights holder and incorporating rightsholder trademarks.

36. A user then uses the torrent site to connect with other users and exchange content though the BitTorrent protocol often with many users at the same time.

37. Internet piracy, and in particular BitTorrent piracy, though known as peer-to-peer file sharing, is often a for-profit business as many software clients, torrent sites and networks generate millions of dollars in revenue through sales and advertising.

38. Many parties, and possibly defendant, have paid money to facilitate or permit increased access to content which has been made available without authorization.

39.     To increase the value of the advertising and sometimes subscription access sold by torrent sites, many parties work to expand the pool of available titles and speed of downloads available by increasing the number of member peers and thus the desirability of their clients and networks.  To accomplish this they reward participants who contribute by giving them faster download speeds, greater access, or other benefits.

40.     A torrent site will also often present authentic advertising and branding of a motion picture to increase desirability, together with a record of the number peers sharing the file to entice users to use their torrent site and join with others sharing a file through the torrent site, as such, the participation of a party like the defendant furthers the interests of the for-profit torrent site.

41.     A significant element of the BitTorrent model is that those who participate and download movies not only share and upload movies with others, but participants are often rewarded through various means based on the volume and availability of content participants in turn provide to the network.   In sum, there is a feedback incentive for participants as they obtain not only the benefit of their pirated copy of a movie, but they obtain other benefits by increasing and promoting the availability of pirated content to others, even if such benefit is limited to increased access to other pirated content.

42.     Many parties, and possibly defendant have been compensated for their participation in expanding the availability of pirated content to others through BitTorrent networks, including plaintiff's movie.

43.     Defendant's participation in the BitTorrent exchange of plaintiffs' motion picture is the type of activity that torrent sites use to promote their business and likely directly furthered the for-profit business of at least one torrent site.

44.     For years, many artists lamented that their work was being commoditized and sold by profiteering industries that exploited them through controlling the means of distribution and market access.  But with new technologies and the advent of the piracy model of distributed and peer-to-peer networks, such exploitation now takes the form of advertising revenue driven piracy supported by millions of people who collectively exploit and destroy the creative market, attempt to hide in their perceived crowd-based anonymity, and excuse their conduct with the false statement that their small piece of straw does not burden the camel.

45.     As stated by James Osterberg a/k/a Iggy Pop, in the BBC Music John Peel Lecture, Oct. 13, 2014:

> But now, everybody's a bootlegger, but not as cute, and there are people out there just stealing the stuff and saying don't try to force me to pay. And that act of thieving will become a habit and that's bad for everything.
> ***
> So is the thieving that big a deal? Ethically, yes, and it destroys people because it's a bad road you take….

46.     The use of BitTorrent does more than cause harm through the simple theft of intellectual property.  The BitTorrent distribution of pirated files is a model of business that profits from theft through sales and advertising and provides a system of rewards and compensation to the participants, each of whom contribute to and further the enterprise.

47.     Based on activity observed associated with defendant's IP address, defendant is a prolific proponent of the BitTorrent distribution system advancing the BitTorrent economy of piracy.

FACTS OF THE CLAIM

IP Address

48.     An Internet Service Provider, ("ISP"), grants access to the Internet and the ability to send and receive information, whether in the form of an email, photo or motion picture.  To connect to

the Internet a user must contract with an ISP and create an account for service either directly, or through an intermediary such as a subscriber.

49.     The ISP then generally assigns each subscriber a unique IP address, often for an extended period of time.  An IP address is like the address used on an envelope.  It is the public identifier each user uses to tell the world not only where they are sending data from, but the location to where any requested data should be sent.

50.     The defendant has been identified as the party using a specific IP address at a specific time.

51.     Plaintiff has, to a reasonable degree of scientific certainty, learned the ISP used by the infringer, the torrent file copied and distributed by the infringer as identified by file hash, the BitTorrent client application utilized by the infringer, and the general location of the infringer, as determined by geolocation technology.

### Conduct of Infringer

52.     Plaintiff has recorded the infringer identified herein as copying and publishing plaintiff's motion picture via BitTorrent, as plaintiff's investigator has made a direct TCP/IP connection with the defendant's computer and downloaded content to confirm defendant is actively distributing the motion picture.  This direct two-way TCP/IP connection overcomes potential "spoofing" or any question as to whether or not defendant is actually involved in the distribution of plaintiffs' motion picture.

53.     On operation, the infringer accessed the Internet either as the subscriber to the ISP (Comcast) account or through access provided by the subscriber.  The infringer then initiated his or her infringing conduct by first intentionally logging into one of many BitTorrent client repositories known for their large index of copyrighted movies, television shows and software.  The infringer then intentionally obtained a torrent file identified by a "hash" which was attached

to plaintiffs' motion picture from the index and intentionally loaded that torrent file into a computer program or client designed to read such files.

54.     With the torrent file intentionally loaded by the infringer, his or her BitTorrent client used the BitTorrent protocol to initiate connections with possibly hundreds of other users possessing and uploading or sharing copies of the digital media described in that same hash, namely, plaintiffs' motion picture.  As the motion picture was copied to the infringer's computer piece by piece, these downloaded pieces of plaintiffs' motion picture were then published and made available for upload to other users' computers.  Thus, the infringer not only participated in the BitTorrent downloading the plaintiffs' motion picture, but also uploaded or published the work via BitTorrent and made it available to others.

55.     Once the defendant joined with the other peers in the exchange of the motion picture, the defendant's status as another "peer" is then available to the torrent site to use to further the promotion of the use of the torrent site which in conjunction with the use of plaintiffs' images and trademarks promotes the infringement of plaintiffs' rights furthering the economic model of piracy.

56.     On information and belief, the infringer's conduct was unauthorized and in violation of the license and terms of access to the Internet through his or her ISP.

57.     Upon information and belief, the infringer was a willing and knowing participant in the infringing of plaintiffs' rights.

58.     Upon information and belief, the infringer also obtained compensation or other personal benefit through making content, including plaintiff's motion picture, available to others, even if such compensation was only increased access to other infringing works.

///

## FIRST CLAIM FOR RELIEF

## COPYRIGHT INFRINGEMENT

59.     Defendant, without the permission or consent of DBC, copied and distributed plaintiffs' motion picture through a public BitTorrent network.

60.     Defendant's actions infringed DBC's exclusive rights under The Copyright Act.

61.     Defendant's conduct has been willful, intentional, in disregard of and indifferent to DBC's rights.

62.     As a direct and proximate result of defendant's conduct, DBC's exclusive rights under 17 U.S.C. § 106 have been violated.

63.     DBC is entitled to damages pursuant to 17 U.S.C. § 504 and attorney fees and costs pursuant to 17 U.S.C. § 505.

64.     The conduct of defendant is causing and, unless enjoined and restrained by this Court, will continue to cause plaintiffs great and irreparable injury.

65.     Pursuant to 17 U.S.C. §§ 502 and 503, DBC is entitled to injunctive relief prohibiting defendant from further contributing to the infringement of DBC copyrights and ordering that defendant destroy all copies of the motion picture made in violation of DBC rights.

## SECOND CLAIM FOR RELIEF

## ALTERNATE THEORY – INDIRECT INFRINGEMENT

66.     Plaintiffs repeat and reallege each of the allegations above.

67.     Defendant obtained Internet access through an ISP and knowingly or with willful disregard permitted, facilitated and promoted the use of the Internet access for the infringing of DBC's exclusive rights under The Copyright Act by others.

68. Defendant failed to reasonably secure, police and protect the use of their Internet service against use for improper purposes such as piracy, including the downloading and sharing of the motion picture by others.

69. Defendant's failure was with notice as piracy is in violation of the license for access granted to defendant by their ISP which issued defendant an IP address to access the internet.

70. Defendant's failure was with notice as the volume of activity associated with defendant's IP address is such that defendant either knew of or should have known of the infringing activity.

71. Defendant is liable as an indirect or secondary infringer.

72. Defendant's conduct has been willful, intentional, in disregard of and indifferent to plaintiffs' rights.

73. As a direct and proximate result of defendants' conduct, DBC exclusive rights under 17 U.S.C. § 106 have been violated.

74. DBC is entitled to damages pursuant to 17 U.S.C. § 504 and attorney fees and costs pursuant to 17 U.S.C. § 505.

75. The conduct of defendant is causing and, unless enjoined and restrained by this Court, will continue to cause plaintiffs great and irreparable injury.

76. Pursuant to 17 U.S.C. §§ 502 and 503, DBC is entitled to injunctive relief prohibiting defendant from further indirect infringement of its copyrights and ordering that defendant destroy all copies of the motion picture made in violation of its rights and take such further steps as are necessary to prevent further indirect infringement.

THIRD CLAIM FOR RELIEF

ORS 647.105 – STATE TRADEMARK

77. Plaintiffs repeat and reallege each of the allegations above.

78. Pursuant to ORS 647.095, a person who without the consent of Voltage uses the VOLTAGE PICTURES mark in connection with the distribution of a reproduction or counterfeit of a motion picture is liable for the equitable remedies provided in ORS 647.105.

79. Pursuant to ORS 647.105, "The owner of a mark registered under this chapter may proceed in a civil action to seek an injunction against the … use, display or sale of a counterfeit or imitation of the mark."

80. Voltage comes to this court seeking the equitable remedies provided by ORS Chapter 647, namely an injunction against those who would, without authorization, reproduce and distribute motion pictures which bear its registered trademark.

81. Defendant, without the authorization or consent of Voltage, used and distributed a reproduction or counterfeit of a motion picture bearing Voltage's registered trademark VOLTAGE PICTURES.

82. Defendant's conduct was in support of a furtherance of the commercial distribution of the motion picture by for-profit commercial enterprises that promote and facilitate the distribution of plaintiffs' motion picture using Voltage's trademarks and trade name in association with such promotion, including the use of movie trailers and posters branded with the VOLTAGE PICTURES mark.

83. The presentation and promotion of plaintiffs' motion picture for distribution through the BitTorrent file sharing system and torrent sites, when coupled with the use of movie trailers and posters, branded with the VOLTAGE PICTURES mark, is presumed to lead to confusion.

84. Defendant has acted with knowledge and in bad faith in their infringement of Voltage's rights.

85. Voltage is entitled to an order of from this court enjoining defendant from infringing its rights and directing defendant to delete all unauthorized copies of Voltage's motion pictures.

## DAMAGES

86.     Plaintiff DBC has been damaged and claims statutory damages from the infringer pursuant to 17 U.S.C. § 504(c)(2).

87.     Plaintiffs each have been damaged and claim equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against defendant as follows:

- A.    For entry of permanent injunction enjoining defendant from directly, indirectly or contributory infringing plaintiffs' rights, including without limitation by using the internet to reproduce or copy plaintiffs' motion pictures, to distribute plaintiffs' motion pictures, or to make plaintiffs' motion pictures available for distribution to the public, except pursuant to a lawful license or with the express authority of plaintiffs.  And further directing defendant to destroy all unauthorized copies of plaintiffs' motion pictures;
- B.    Statutory damages pursuant to 17 U.S.C. § 504.
- C.    For plaintiffs' reasonable costs and attorney fees pursuant to 17 U.S.C. § 505; and
- D.    For such other and further relief as the Court deems proper.

///

///

DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury.

DATED: November 22, 2014

Respectfully submitted,

CROWELL LAW

/s/Carl D. Crowell
Carl D. Crowell, OSB No. 982049
carl@crowell-law.com
503-581-1240
Of attorneys for the plaintiffs